IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WENDY S. GRIMSLEY, )<br>)<br>Plaintiff, )<br>)<br>-versus- )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | **MEMORANDUM OPINION<br>AND RECOMMENDATION**<br><br>Civil Action No.: 1:07CV00763 |

Plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits under Title II of the Social Security Act (the "Act").[1] The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

**Procedural History**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on April 13, 2004, with a protective filing date of April 1, 2004, alleging a disability onset date of March 31, 2004. (Tr. 41-44.) The application was denied initially and upon reconsideration. (Id. at 21, 22.) Plaintiff next requested a hearing de novo before

---

[1] The Social Security Disability Insurance Program was established by Title II of the Act, 49 Stat. 622 (codified at 42 U.S.C. § 401 et seq.).

an Administrative Law Judge ("ALJ").  (Id. at 33.)  Present at the hearing, held on June 6, 2006, were Plaintiff and her attorney.  (Id. at 237.)

By decision dated November 3, 2006, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  (Id. at 20.)  On August 31, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (id. at 4), thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1-2. The claimant held insured status on the alleged disability onset date of March 31, 2004.  She has not engaged in substantial gainful activity since that date.
>
> 3-4. The medical evidence establishes that the claimant has severe impairments including fibromyalgia and depression, but that these impairments do not meet or equal the criteria of any of the impairments in Appendix 1, Subpart P, Regulations No. 4.
>
> 5. The claimant has the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for six hours in an eight hour workday; sit for six hours in an eight hour workday; and to push and pull with both extremities.  She has no limit on her ability to perform fine and gross manipulations, but she requires a sit and stand option throughout the day for thirty minute increments due to pain.  She can never climb ropes or ladders and she can only occasionally squat and bend.  She is able to carry out simple but not detailed instructions, and she can respond appropriately to supervisors, coworkers and the general public.
>
> 6. The claimant is unable to perform her past relevant work ("PRW") as a social services case manager, cashier, leather cutter, day care provider, home health aide, office clerk or pharmacy technician.

7-9. The claimant was born on August 30, 1967 and was thirty-six years old on her alleged disability onset date, and thus is defined as a "younger individual" under 20 C.F.R. 404.1563. She has at least a high school education and is able to communicate in English. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, regardless of whether the claimant has transferable job skills.

10-11. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform. The claimant, therefore, has not been under a disability, as defined in the Act, at any time from March 31, 2004 through the date of this decision.

(Tr. 13-20.)

**Analysis**

In her brief before the court, Plaintiff argues that the ALJ committed reversible error by failing to properly evaluate Plaintiff's credibility regarding her allegations of disabling insomnia and fatigue. The Commissioner argues in response that substantial evidence supports the ALJ's finding that Plaintiff's claims concerning the disabling effects of her symptoms are not entirely credible.

Scope of Review

The Act provides that, for "eligible"[2] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

---

[2] Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1).

3

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration (the "SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listings of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing any other work. 20 C.F.R. § 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir. 1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986)); see also Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (the issue before the court is not whether the claimant is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law).

Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was thirty-eight years of age. (See Tr. 42) (giving Plaintiff's date of birth). She has a twelfth grade education (id. at 63), and PRW that includes social services case manager, cashier, leather cutter, day care provider, home health aide, office clerk and pharmacy technician. (Id. at 57-58.) Plaintiff initially alleged disability due to "fibromylasia [sic], depression, gerd,[3] anxiety [sic], panic attacks, insomnia, [and] obesity ." (Id. at 56.)

The ALJ found that Plaintiff had not engaged in substantial gainful activity at any time relevant to the ALJ's decision. She also found that Plaintiff met the

---

[3] Gastroesophageal reflux disease.

disability insured status requirements of the Act as of the alleged disability onset date and that she will continue to meet them through December 31, 2009. (Id. at 15.) The ALJ further determined that the medical evidence warranted a finding that Plaintiff suffered from severe impairments of fibromyalgia and depression. She nevertheless concluded that Plaintiff's severe impairments did not meet or equal any of the Listings of Impairments.

Fibromyalgia

Before addressing Plaintiff's arguments, it appears incumbent upon the court to first discuss Plaintiff's fibromyalgia diagnosis. As the Seventh Circuit explained in the seminal case of Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996):

> [F]ibromyalgia, also known as fibrositis [is] a common, but elusive and mysterious, disease[.] See Frederick Wolfe et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 Arthritis & Rheumatism 160 (1990)[4]; Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, Current Medical Diagnosis & Treatment 1995 708-09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the

---

[4] The text of this article, referred to hereafter as the "ACR Criteria," can also be found online at http://www.rheumatology.org/publications/classification/fibromyalgia/1990_ Criteria_for_Classification_Fibro.asp (last visited March 17, 2009).

6

> specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. There is no serious doubt that [claimant] is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 British Med. J. 386 (1995); Preston v. Secretary of Health & Human Services, 854 F.2d 815, 818 (6th Cir. 1988) (per curiam), but most do not and the question is whether [claimant] is one of the minority.

Id. at 306-07 (footnote added). See also ACR Criteria 160 ("The newly proposed criteria for the classification of fibromyalgia are 1) widespread pain in combination with 2) tenderness at 11 or more of the 18 specific tender point sites."). The Second Circuit has observed that "a growing number of courts, including our own, have recognized that fibromyalgia is a disabling impairment." Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003) (citing cases from the 7th, 8th, and 9th circuits) (internal citation omitted).

Credibility

The Fourth Circuit has set out a two-step process for evaluating a claimant's credibility with regards to her subjective complaints of pain and symptoms in accordance with the Commissioner's regulations. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); 20 C.F.R. § 404.1529; see also Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements ("SSR 96-7p").

7

Under the Craig analysis, Plaintiff must first produce objective medical evidence of an impairment which could reasonably be expected to produce pain or other subjective symptoms in the amount or degree she alleges. At step two of the Craig analysis, the ALJ must evaluate the intensity, persistence and functionally limiting effects of Plaintiff's pain. The Regulations require the ALJ to consider the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness and adverse side effects of any pain medication; treatment, other than medication, for relief of pain; functional restrictions; and daily activities. 20 C.F.R. § 404.1529(c)(3); see also SSR 96-7p.

The fact finder may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. See SSR 96-7p. But neither is the adjudicator to accept the claimant's statements at face value; rather, she "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p; see also Craig, 76 F.3d at 592 ("'Pain is not disabling per se, and subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof.'" (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)).

In this matter, Plaintiff testified that on average, she sleeps three or four hours a night, and that her insomnia, pain and depression leave her severely fatigued. (Tr. 263-64, 266.) She stated that she has good days and bad days, with bad days occurring three or four days a week. (Id. at 263, 265.) On bad days, Plaintiff

8

testified, she gets her children ready for school and then returns to bed, unable to do anything due to her depression, pain and fatigue. (Id. at 264.) She explained, "I stay so tired I don't ever feel like doing anything because I'm so fatigued. I just feel like a Mack truck's hit me. I feel like I just can't put one foot in front of the other and I just get tired of feeling this way." (Id.)

The ALJ considered the record evidence, and concluded that although Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Id. at 17.) The ALJ found Plaintiff's claims credible concerning her difficulty in performing heavy exertional activities, and accordingly reduced her residual functional capacity to light work with postural limitations. The ALJ further reduced Plaintiff's residual functional capacity to include being able to carry out only simple instructions to allow for Plaintiff's mental limitation and Plaintiff's testimony that she experienced good and bad days. (Id. at 18.) To the extent that Plaintiff claimed that she is unable to perform any work, however, the ALJ found these allegations not credible due to significant inconsistencies in the record as a whole. (Id.) In support of these findings, the ALJ reasoned that Plaintiff received only conservative treatment for her fibromyalgia, she had not been hospitalized, and she had not received mental health treatment. Moreover, the ALJ stated, Plaintiff's claims were inconsistent with her activities of daily living, which included, according to the ALJ, playing piano at church

9

three times per week, trying to attend piano practice at church twice a month, performing household chores and caring for her children. (Id.)

Plaintiff argues that the ALJ erred in failing to specifically evaluate the credibility of Plaintiff's specific symptom allegations, namely insomnia and severe fatigue, as required by 20. C.F.R. § 404.1529 and SSR 96-7p. (Pleading No. 11, Pl.'s Br. at 8.) Plaintiff further argues that the ALJ failed to adequately consider whether Plaintiff's symptom allegations were supported by the record evidence, specifically, the treatment and other records from Plaintiff's treating physician, Dr. Douglas E. Schultz. (Id.) Finally, Plaintiff argues that the ALJ's characterization of Plaintiff's testimony concerning her activities of daily living is overstated. (Id.) The Commissioner contends, however, that substantial evidence supports the ALJ's credibility findings. (Pleading No. 13, Def.'s Br. at 6.)

On the date that Plaintiff alleges her disability commenced, March 31, 2004, she was working five days a week for three hours a day as a home health aide, providing care, cooking, and light housekeeping to an elderly client. (See Tr. 85, 245.) Plaintiff continued to work in this job until June 2005. (Id. at 245.) In light of Plaintiff's testimony that she was able to work and care for her client five days a week despite her alleged pain and fatigue, the court finds that for the period from

10

March 31, 2004 until June 2005,[5] there is substantial evidence to support the ALJ's credibility assessment. Nevertheless, the record evidence reflects that Plaintiff quit her part-time job sometime in June 2005 because her worsening pain and fatigue left her incapable of working. (Id. at 226, 246.) For the period after the date that Plaintiff could no longer work, the court finds that the ALJ's credibility assessment is not supported by substantial evidence.

This court is mindful that an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). Nevertheless, contrary to the ALJ's finding, the court finds that Plaintiff's medical records are entirely consistent with her subjective complaints of insomnia and severe fatigue. Moreover, the ALJ overstated the extent of Plaintiff's daily activities, which, when accurately evaluated, are not substantial evidence sufficient to support the ALJ's credibility finding.

Plaintiff was initially diagnosed with fibromyalgia in 1999, at which time she complained of muscle pain occurring day and night, and daytime fatigue. (Tr. 134-35.) It appears from the record that Plaintiff was seen by Dr. Schultz in April 2003 for "further evaluation and management of severe disabling fibromyalgia." (Id. at 130.) Plaintiff was taking Zoloft, Celebrex and Trazodone at the time, but she

---

[5] There is no evidence in the record indicating exactly when Plaintiff quit working. On remand, the Commissioner is to obtain evidence and make a finding concerning the date that Plaintiff quit her job.

11

continued to complain of persistent insomnia, total fatigue, malaise and lack of energy. (Id.) Dr. Schultz increased Plaintiff's Zoloft and Trazodone dosages in an effort to alleviate her symptoms. In June 2003, Dr. Schultz reported that Plaintiff's fibromyalgia was "minimally improved" with her increased medication, although she continued to complain of periods of profound insomnia. (Id. at 129.) Dr. Schultz also noted that he had prescribed several different sleep medications for Plaintiff in the past, but that she was unable to take them due to side effects. (Id.) Plaintiff returned to Dr. Schultz in September 2003 complaining of worsening pain and continuing sleep difficulties. (Id. at 127.) Dr. Schultz again increased Plaintiff's medication dosages. (Id.) In November, Plaintiff reported that she was having a good day and that her fibromyalgia and insomnia were stable (Id. at 126). By March 2004, however, Plaintiff's fibromyalgia was again worsening, with muscle pain and daytime fatigue severe enough to cause Plaintiff to quit one of her jobs. (Id. at 122.) Dr. Schultz reported that Ultram[6] taken four times a day did not provide pain relief and that various antidepressants and muscle relaxants caused daytime fatigue. (Id.) Dr. Schultz further noted that Plaintiff was "maxed out" on 200 mg per day of Zoloft; however, he again increased her Trazodone dosage in an attempt to alleviate Plaintiff's ongoing sleep disturbances. (Id. at 122-23.) Dr. Schultz again described Plaintiff's condition as severe and disabling, and opined that although Plaintiff

---

[6] Ultram is prescribed for pain relief and is similar to a narcotic. WebMD.com, http://www.webmd.com/drugs/drug-11276-Ultram+Oral.aspx?drugid=11276&drugname=Ultram+Oral.

12

continued to work three hours a day, he considered her unemployable due to her discomfort. (Id. at 123.)

In August 2004, Plaintiff complained that Trazodone was no longer helping with her severe insomnia, and Dr. Schultz prescribed Ambien. (Id. at 120.) In November, Plaintiff reported constant pain and episodic severe insomnia, and Dr. Schultz again described her condition as severe and disabling. Dr. Schultz also noted that Plaintiff was suffering from peripheral edema. (Id. at 229.) In February 2005, Plaintiff reported worsening fibromyalgia, fatigue and malaise. She complained that she was weak and tired and was also having difficulty with stress and anxiety. (Id. at 227.) In August 2005, Plaintiff's fibromyalgia continued to worsen, with increases in weakness, fatigue, malaise, muscle pain and insomnia. Plaintiff reported that she was sleeping only two hours a night and that she was no longer able to work at all and had quit her part-time job. (Id. at 225.) Dr. Schultz noted that despite Plaintiff's worsening condition, he was hesitant to prescribe more medications because Plaintiff was already taking so many. (Id.) Plaintiff continued to complain of severe pain and fatigue (see id. at 222-24), and in May 2006, Dr. Schultz added Lyrica[7] to Plaintiff's medication regime in an attempt to alleviate her symptoms. (Id. at 222.)

---

[7] Lyrica is prescribed to treat pain in patients with fibromyalgia. WebMD.com, http://www.webmd.com/drugs/drug-93965-Lyrica+Oral.aspx?drugid=93965&drugname= Lyrica+Oral.

13

In assessing Plaintiff's credibility, the ALJ reasoned that Plaintiff had received only conservative treatment for her fibromyalgia. The medical records reflect, however, that Dr. Schultz repeatedly changed Plaintiff's medications and dosages in an effort to better alleviate her pain and fatigue. (See, e.g., id. at 120, 122, 123, 127, 222, 228.) This fact indicates that Dr. Schultz believes that Plaintiff's fibromyalgia has not been well-controlled, and according to Plaintiff, he does not know what to do further to treat her. (See id. at 266.) Furthermore, Dr. Schultz consistently described Plaintiff's condition as severe, and indeed, opined repeatedly that her condition was so severe as to be disabling. The final responsibility for deciding disability is an issue expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). Although such medical opinions are not entitled to controlling weight or special consideration, they must be considered as part of the record in its entirety. See generally, SSR 96-7p.

Plaintiff's testimony is also consistent with and is supported by the findings of Dr. Gregory A. Villarosa, a state agency psychologist. Dr. Villarosa examined Plaintiff and performed a Comprehensive Mental Status Evaluation on June 14, 2004. (See Tr. at 170-73.) Dr. Villarosa noted that Plaintiff was oriented in all spheres but had only fair memory and scattered attention and concentration. (Id. at 172.) Plaintiff became panicked when asked to subtract single digits, began to hyperventilate and needed calming from Dr. Villarosa. (Id.) Dr. Villarosa concluded that Plaintiff showed significant depression and regular panic attacks, and that

14

Plaintiff did not evidence the mental ability to adapt to full-time employment. (Id. at 172-73.)

The ALJ also discounted Plaintiff's testimony on the basis that Plaintiff had not received mental health treatment. Plaintiff did seek psychological treatment and went to two appointments in 2004, however. (See Tr. at 186-91.) She testified that she wanted to continue treatment, but that her family had then recently filed for bankruptcy and that she was unable to afford the forty dollar co-pay. (Id. at 250.) She further testified that she was not told about community mental health treatment centers where she might receive treatment. (Id.) "A claimant may not be penalized for failing to seek treatment she cannot afford; '[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986)(quoting Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)).

The ALJ also overstated the extent of Plaintiff's daily activities. The ALJ based her credibility assessment, in part, on her finding that Plaintiff "testified that she played piano three times per week at church, and that she tried to attend rehearsals twice per month. She also stated that she performed household chores, and that she cared for her children." (Tr. 18.) This is not an accurate representation of Plaintiff's testimony concerning her daily activities. On school days, she wakes up her two children (aged seven and thirteen at the time of the hearing) and sends

15

them off to school on the bus less than an hour later. She does not cook them breakfast. (Id. at 252.) On bad days, Plaintiff returns to bed after her children leave for school. (Id. at 255, 264.) On the days that she is able to get out of bed, she is sometimes able to do housework during the day, but has to start and stop and has difficulty completing it. (Id. at 253-54.) She goes grocery shopping "once in a blue moon" and sometimes prepares snacks for her children when they return from school. (Id.) Plaintiff further testified that she was able to get to church to play the piano only once or twice a month on Wednesday evenings, and only two or three times a month on Sundays, and that she sometimes needs to leave early. (Id. at 267.)

Having considered the record in its entirely, the court concludes that there is not a sound foundation for the Commissioner's findings. There is not substantial evidence supporting the Commissioner's finding that Plaintiff's subjective complaints are not consistent with the record as a whole.

**Conclusion and Recommendation**

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence and the correct legal principles were not applied. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **REVERSED**, and that the matter be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation.

To this extent, Plaintiff's motion for summary judgment (pleading no. 10) seeking a reversal of the Commissioner's decision should be **GRANTED**. To the extent that Plaintiff's motion seeks an immediate award of benefits, it should be **DENIED**. Defendant's motion for judgment on the pleadings (pleading no. 12) should be **DENIED**.

_____
WALLACE W. DIXON
United States Magistrate Judge

March 20, 2009